Filed 5/22/26  P. v. Gutierrez CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANUEL GUTIERREZ,<br><br>    Defendant and Appellant. | B337278<br><br>(Los Angeles County<br>Super. Ct. No. BA392921) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury found defendant Manuel Gutierrez guilty of murder and found true the special circumstance that he committed the murder intentionally and for financial gain. On appeal, defendant contends the trial court erred when it instructed the jury, using CALCRIM No. 361, that it could draw an unfavorable inference from his failure to explain or deny incriminating evidence at trial. Defendant additionally challenges the court's imposition of certain fees. We modify the judgment but otherwise affirm the conviction.

# II. BACKGROUND

## A. *Information*

In March 2013, the Los Angeles County District Attorney filed an information charging defendant, Sergio Rene Ramirez, and Jose David Lopez with the October 12, 2011, murder of Mayela Garcia. (Pen. Code,[1] § 187, subd. (a).) The information alleged, among other things, that the murder was carried out by defendants intentionally and for financial gain. (§ 190.2, subd. (a)(1).) Defendant proceeded to a jury trial on January 18, 2024.[2]

---

[1]     Further statutory references are to the Penal Code.

[2]     Defendant was tried separately from his codefendants.

B.    *Prosecution Evidence*

In 2011, Garcia was the assistant manager of a laundromat located within a shopping center in territory controlled by the Florencia 13 gang.  Defendant was a former employee of the laundromat and shopping center.  After he was fired from his job, defendant used the laundromat as a venue for his drug sales.  Garcia told defendant that he was not permitted to sell drugs in the laundromat and reported his conduct to the police.

In 2011, Juan V. owed defendant around $30,000 for a drug deal that had gone wrong.  Sometime before October 2011, defendant offered to forgive Juan V.'s debt if Juan V. agreed to kill Garcia.  Defendant told Juan V. that Garcia was messing with his business and he was concerned that she would report him to the police.  Defendant asked Juan V. to shoot Garcia with a revolver so that no casings would be found at the scene.  Juan V. refused the offer.

Following Juan V.'s refusal, David Barajas, an active member of the Florencia 13 gang, heard from a fellow gang member that defendant wanted Juan V. dead.  Barajas, who was a friend of Juan V., did not intend to kill Juan V. but initiated discussions with defendant so that he could provide information to Juan V., who eventually left town.  Defendant offered to pay Barajas $3,000 to kill Juan V.  When Barajas expressed interest in the offer, defendant told him payment would be conditioned on receipt of a "mortuary picture," that is, a photograph of the murdered victim.  Barajas "brought in" Lopez to confirm the killing.  Defendant paid Barajas $1,500 up front and agreed to give him the additional $1,500 after receipt of the mortuary picture.

3

During their discussion about the murder of Juan V., defendant told Barajas that he also wanted Garcia killed. According to defendant, "she was getting under his nerves. And she wanted him incarcerated. Or she would call the police to try to accuse him about certain things." Defendant suggested that Barajas kill Garcia when she took out the trash in the evening "because there are no cameras back there."

Barajas then avoided talking to defendant, but Lopez kept calling Barajas to ask him to participate in Garcia's murder. Barajas eventually told Lopez that he would not kill Garcia and that Lopez should find someone else. Lopez told Barajas that he was going to ask Ramirez to participate.

Three to four weeks before the murder, a security guard employed by the shopping center installed surveillance cameras in the rear of the laundromat, where the dumpsters were located. Surveillance video showed that on October 12, 2011, at approximately 10:00 p.m., Garcia walked out of the laundromat to the dumpsters located in the alleyway behind the laundromat. A man ran up to Garcia, shot her on the side of the head, and then ran away. A witness saw the man run into a Chevrolet that belonged to Lopez. Garcia did not survive her injuries. Police recovered a bullet from the scene of the shooting and determined that it was of the type that is typically ejected from a revolver.

After the murder, Barajas asked Ramirez what had happened. Ramirez admitted that he was the shooter and that Lopez had paid him $800 for the killing. Barajas also discussed Garcia's murder with Lopez, who initially denied participating in the killing but later admitted, "'All right. You got me.'"

Soon after the murder, Gilberto Smith, who had been friendly with Garcia, hear a rumor that defendant was

4

responsible for the killing.  When Smith asked defendant what happened to Garcia, defendant responded, "'I sent someone to kill that stupid bitch for calling the cops on me.'"  Defendant told Smith that Garcia "should never have called the cops in the first place because she was messing with his business."

On January 12, 2012, police officers arrested Ramirez and placed him in a jail cell with an undercover agent.  Ramirez admitted to "pop[ping]" Garcia with "[j]ust one shot."  Ramirez said that he was worried that defendant was cooperating with the police.

Police officers arrested defendant on January 16, 2012.  During a recorded interview that was played for the jury, the police asked defendant why people on the street were saying that he was responsible for Garcia's murder.  Defendant responded, "Okay.  They're supposed to beat up the lady, but I think they took it too far."  Defendant claimed he was surprised to learn that Garcia had been killed.


C.     *Defendant's Testimony*


Defendant testified at trial, among other things, that he met Barajas in September 2011, when Barajas put a gun in defendant's face and demanded that defendant pay him $1,500 as a tax for selling marijuana in Florencia 13 territory.  He asked Barajas "to beat up the lady."  Lopez was in the car at the time of that conversation.  On cross-examination, after the prosecutor twice asked defendant why he did not contact Barajas and Lopez

5

to ask why they killed Garcia instead of beating her up, defendant could not provide a responsive answer.[3]

D.    *Conviction and Sentencing*

On February 21, 2024, a jury found defendant guilty of first degree murder.  It also found true the special circumstance allegation that defendant committed the murder intentionally and for financial gain.

On March 15, 2024, the trial court sentenced defendant to life in prison without the possibility of parole.  The court also imposed a $200 restitution fine and a $200 parole revocation fine.  On July 2, 2024, the court issued an abstract of judgment that reflected a $300 restitution fine and a $300 parole revocation fine.  Defendant timely filed notice of appeal.

---

[3]    The prosecutor and defendant had the following exchange:

"Q.    When you found out that Ms. Garcia was murdered, why didn't you contact Mr. Barajas or Mr. Lopez and ask them why they went too far?

"A.    The next day I went to the doughnut shop.  When I was coming back, right in the back of the 99 Cents store on the patio, I see the black car coming the detective said."  The prosecutor objected to the response as nonresponsive and the court sustained the objection and struck the response.

The prosecutor then asked defendant, "Don't you think it's odd that you paid them money to have her beat up, and then she ended up murdered?  You didn't think to contact them about that and talk to them about that?"  Defendant again provided an answer that was nonresponsive and the trial court sustained the prosecutor's objection and struck the response.

## III.   DISCUSSION

### A.   *CALCRIM No. 361*

Defendant contends the trial court erred when it instructed the jury with CALCRIM No. 361 as follows:  "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt.  [¶]  If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

According to defendant, the instruction was not supported by the evidence because although defendant's testimony may have been "bizarre, illogical, or implausible," he did not fail to deny or explain the evidence against him.  He further contends that the error affected his substantial rights.  The Attorney General responds that defendant forfeited his argument on appeal by failing to object to the instruction in the trial court.[4] The Attorney General alternatively argues that the court did not err in delivering the instruction and that any assumed error was harmless.

---

[4]    At trial, defendant joined in a request for the court to deliver the instruction.

1. Legal Principles

"A CALCRIM No. 361-based jury instruction 'applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge.' ([*People v.* ]*Cortez* [(2016)] 63 Cal.4th [101,] 117 [(*Cortez*)].) Where a defendant's testimony contradicts or stands in conflict with the state's evidence, such 'contradiction is not a failure to explain or deny.' ([*People v.* ]*Saddler* [(1979)] 24 Cal.3d [671,] 682 [(*Saddler*)]; see [*People v.* ]*Lamer* [(2003)] 110 Cal.App.4th [1463,] 1469.) Nor is the instruction appropriate even when a defendant's testimony may seem 'improbable, incredible, unbelievable, or bizarre.' (*Cortez*, [*supra*, 63 Cal.4th] at p. 117.)" (*People v. Grandberry (*2019) 35 Cal.App.5th 599, 606 (*Grandberry*).) "[T]he task of the reviewing court in examining a claim that a CALCRIM No. 361-based jury instruction was improperly given is 'to ascertain if [the] defendant … failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination' and was 'within [the defendant's] knowledge which he did not explain or deny.' (*Saddler*, [*supra*, 24 Cal.3d] at p. 682.)" (*Grandberry*, *supra*, 35 Cal.App.5th at p. 606.)

2. Analysis

We will assume that defendant did not forfeit his challenge to the jury instruction by failing to object at trial and thus consider the merits of his argument. (See, e.g., *Grandberry*, *supra*, 35 Cal.App.5th at p. 604.) Here, Barajas and Juan V. testified that defendant asked them to kill Garcia. Barajas also

8

testified that Lopez and Ramirez admitted to killing Garcia. And, Smith testified that defendant told him that he "'sent someone to kill that stupid bitch for calling the cops on me.'"

At trial, defendant testified that he paid "them," presumably Barajas and Lopez, to beat up Garcia but that he had not asked them to kill her. Yet defendant could not explain why he did not ask Barajas and Lopez why they had killed Garcia. Defendant's reasons for failing to inquire about the killing were "peculiarly within his knowledge to address" and thus his failure to provide them "forms the evidentiary basis for the CALCRIM No. 361 instruction." (See *Grandberry, supra*, 35 Cal.App.5th at p. 607 [no error in instructing the jury with CALCRIM No. 361 where defendant failed to explain or deny why he "'agreed'" to being placed in administrative segregation if he had not actually possessed a weapon, which was an incriminating fact that was peculiarly in defendant's knowledge]; *People v. Barrett* (2025) 17 Cal.5th 897, 992 (*Barrett*) [where defendant admitted to stabbing his prison cellmate but contended he acted in self-defense, his testimony that he could not recall how he cut a weapon out of a desk supported delivery of CALJIC No. 2.62, an instruction equivalent to CALCRIM No. 361, because "defendant's lack of knowledge about *how* he cut the weapon from the desk was a circumstance defendant could reasonably be expected to know"].) The trial court therefore did not err in instructing the jury pursuant to CALCRIM No. 361.

Even if the trial court had erred in delivering the instruction, we would find the assumed error harmless. (See *Barrett, supra*, 17 Cal.5th at p. 993 [applying the *Watson*[5] standard of prejudice to assumed errors in delivering CALJIC

---

[5] *People v. Watson* (1956) 46 Cal.2d 818, 836.

9

No. 2.62 instruction].)  Indeed, "[a]ny harmful impact of the instruction was mitigated by its very language," which explained to jurors that the instruction only applied "'[i]f the defendant failed in his testimony to explain or deny evidence against him, and … he could reasonably be expected to have done so based on what he knew," and "[a]ny such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt." (*Id.* at pp. 992–993, CALCRIM No. 361.)  The jury also received other instructions that mitigated any harmful impact from the delivery of CALCRIM No. 361.  The court instructed that, in determining witness credibility, the jury could consider factors such as, "Did the witness understand the questions and answer them directly?" and "How reasonable is the testimony when you consider all the other evidence in the case?"  The court also advised that, "If you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."  Further, defendant, during his testimony, explained and denied a critical portion of the prosecution's case, namely, he denied paying Barajas and Lopez to kill Garcia.  Finally, the prosecutor did not refer to CALCRIM No. 361 during closing argument or rebuttal.  "Considering the instructions and the record as a whole, it is not reasonably probable that any negative inference drawn from defendant's failure to explain less critical evidence [that is, why he did not ask Barajas and Lopez why they had killed Garcia], affected the outcome of his case." (*Barrett*, *supra*, 17 Cal.5th at p. 993.)

10

B.      *Challenge to Fines*

Defendant next contends that the abstract of judgment must be modified to reflect the $200 restitution fine orally imposed by the trial court and to remove the imposition of a parole revocation fine, which is inapplicable to defendants who are sentenced to life without the possibility of parole. The Attorney General concedes the error and we agree. We will therefore order the abstract of judgment to be modified.

## IV. DISPOSITION

The abstract of judgment is modified to reflect the imposition of a $200 restitution fine, rather than a $300 restitution fine, and to strike the imposition of a parole revocation fine. The clerk of the court is directed to forward a copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

I concur:

MOOR, J.

The People v. Manuel Gutierrez
B337278


BAKER, Acting P. J., Concurring


I join all but Part III.A of the opinion for the court.  As to the portion of the opinion I do not join, which concerns whether the trial court erred by giving a CALCRIM No. 361 instruction, I believe any error was invited.  (See generally *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 ["'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest.  If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . .  [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.'  In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule"].)

The trial court in this case gave the defense three options when responding to proposed jury instructions: object to the instruction, submit to the court the question of whether to give the instruction, or join in requesting the instruction.  Defense counsel affirmatively joined in requesting CALCRIM No. 361 (rather than objecting or merely submitting), and the record establishes a clearly implied tactical reason for doing so.  (The instruction informs jurors they must consider whether a defendant "could reasonably be expected" to have explained or

denied evidence against him, it cautions that a failure to explain is not alone sufficient to prove guilt, and it reminds jurors of the prosecution's burden to prove guilt beyond a reasonable doubt.) That means the invited error doctrine applies and precludes reversal even if giving CALCRIM No. 361 under the circumstances was error.[1] (See *Coffman and Marlow*, *supra*, 34 Cal.4th at 49 ["Here, Coffman's counsel did not merely acquiesce, but affirmatively joined in the challenge to Prospective Juror B., and thus cannot be heard to claim the court erred in excusing her"].)

BAKER, Acting P. J.

---

[1] Because any instructional error was invited, I need not analyze questions of error or prejudice.